707 So.2d 102 (1998)
Mike BELL, et al., Plaintiffs-Appellants,
v.
USAA CASUALTY INSURANCE COMPANY, et al., Defendants-Appellees.
No. 30172-CA.
Court of Appeal of Louisiana, Second Circuit.
January 21, 1998.
Opinion Denying Rehearing February 19, 1998.
*104 Allison Anne Jones, Steven Eric Soileau, Shreveport, for Plaintiffs-Appellants.
Brian D. Landry, Shreveport, for Defendants-Appellees LIGA.
Jack E. Carlisle, Jr., Shreveport, for Defendants-Appellees USAA.
Before MARVIN, NORRIS and STEWART, JJ.
NORRIS, Judge.
This is a claim for personal injuries sustained by 12-year-old Darren Bell in a pedestrian-vehicular accident while he was on a field trip with Calvary Baptist Church. The jury found Darren 90% at fault, the church 10% and the driver free of fault; it awarded special damages only. The court granted JNOV, awarding general damages and loss of consortium. The Bells appeal, contesting both the allocation of fault and quantum. The church, its youth director, Michael Johnson, and their insurer, LIGA,[1] have answered the appeal, as have the driver, Mrs. Kiesewetter, *105 and her insurer, USAA. We affirm the judgment insofar as it absolved Mrs. Kiesewetter and awarded general damages; however, we reallocate fault between Darren and the church, and reverse the award of lost consortium.

Factual background
The accident occurred on Jackson Street in Alexandria on the Sunday before Thanksgiving 1994. Calvary Baptist Church of Shreveport took a group of its teenage members to a youth evangelism conference being held there that week. Darren was two weeks shy of his 13th birthday and perhaps the youngest person on the trip; most attendees were high school age. He also suffered from cerebral palsy which affected his left arm and slowed his gait somewhat, but by all accounts he was otherwise a healthy and intelligent young man. Because of Darren's maturity and fine performance in Bible drill, youth minister Michael Johnson gave him permission to join this trip. Johnson (called "Brother Mike" by most of the witnesses) took 37 teenagers and four adult chaperones in a church minibus and a van. They left for Alexandria at 3:30 Sunday afternoon.
After checking in at their motel, the group went to McDonald's on Jackson Street, a four-lane east-west thoroughfare with no median, densely settled and heavily traveled. By then it was at least twilight; most witnesses said the sky was dark but the area well lighted. The influx of Calvary's teenagers crowded the McDonald's, filling all serving lines, but there was a small pizza parlor in a strip mall across the street and slightly to the west, with apparently no waiting. Several of the boys in the group decided they would prefer to eat pizza without the wait.
The witnesses' accounts diverge in certain particulars. After the students exited the church vehicles, all or most of them filed into McDonald's; Johnson either stood outside the double glass doors to make sure that no one left, or went inside briefly to see that everyone was orderly in the lines. A group of older boys (Jonathan Falloon, Jared Freeman and Jay Baker, all about 16 years old) came to Johnson and asked him if they could leave, cross the street and get pizza. Johnson said yes, and testified that he walked them to the street to make sure they crossed safely. He explained that he did not lead the boys to a nearby traffic light because he considered that more dangerous. Jonathan Falloon testified that Johnson walked them part of the way to the street; Jay Baker had no recollection of whether he walked with them or not. Jonathan also testified that traffic was not bad at the time, so they walked across the street.
Meanwhile, three slightly younger boys (Robby Falloon, Tim Chance and Jonathan Gates) decided they would also like to get pizza. Robby Falloon testified that he asked Johnson, specifically, for permission to do this; Tim Chance recalled that none of this group got specific permission, but just "assumed" it was OK since the other boys were going; and Johnson thought that when Jonathan Falloon had asked permission to leave, it was on behalf of six or seven students. Tim and Robby testified that they ran past the first group in the middle of Jackson Street, in an effort to be first in line for pizza.
The students described the traffic as light to moderate at the time; Tim Chance said he was buzzed by a speeding minivan coming from the right when he was in the middle of the street. Also, nobody recalled seeing Darren at this time; the students, as well as Johnson, assumed he was inside McDonald's.
Darren testified that when he saw the other boys going to the pizza place, he decided he was too hungry to wait at McDonald's. He did not ask Johnson or any of the chaperones for permission to leave; he just "jogged" into the street at an angle, without stopping or looking. In the middle of the street, he saw headlights to his right. He lifted his right arm defensively and was knocked to the ground. He recalls nothing until he woke up at Saint Frances Cabrini Hospital.
The driver of the minivan, Mrs. Kiesewetter, was driving west on Jackson. She testified that she had been waiting at a red light just before the McDonald's, and was in the left lane behind two or three other vehicles; there were also a few cars in the right lane.
*106 When the light turned green, she started forward slowly, but noticed the brake lights on a car to her right. She then saw "two or three kids jogging across the street." She did not brake, but panned the street and saw no one else crossing. Then, when she had almost passed McDonald's she suddenly saw Darren immediately to her left. With no time to brake, she swerved slightly to her right. Nevertheless Darren ran into the side of the minivan, striking the front left quarter panel and the driver's side mirror. After impact, Mrs. Kiesewetter screeched to a halt and U-turned to where Darren lay in the street.
An additional witness, a Ms. Cooper, testified she was driving east on Jackson; as she neared McDonald's she saw "two little groups of boys" running across the street. Although she was not going fast, she had to brake to avoid hitting one of them. She saw no adults standing near the street, and testified that she saw the impact between one boy and a minivan in her rear view mirror.
Darren sustained a broken right arm, mild concussion, bruised kidney and bitten tongue. Doctors at Saint Frances performed an open reduction on his comminuted humerus, and Darren had some blood in his urine. He stayed in the hospital from Sunday night to Tuesday afternoon, and came home wearing an arm-length cast. This was later replaced by shorter casts. He had a brief episode of double vision in late December, which a neurologist attributed to the concussion. Swelling from the fracture compressed his ulnar nerve, necessitating surgery in mid-February 1995, followed by another several weeks in arm casts.
All the time spent with his right arm in a cast or in therapy were hard on Darren, as his left arm was already disabled by cerebral palsy. During this time he was unable to feed himself, dress, or attend to personal hygiene; his parents had to assist him. Feeling that the accident and injury had made Darren withdrawn and moody, the Bells took him to a psychiatrist for two visits in 1995. By the second visit, the depression had resolved. The treating orthopedist concluded that Darren had no residual disability from the accident.
Darren had some social and academic problems for the remainder of the 1994-95 school year; he and his parents described one particular teacher who was less willing to accommodate him for his disability. The following year, however, he made straight A's and was chosen to be his basketball team's mascot. He also participated in a civics contest, winning a trip to California to meet and interview Newt Gingrich.

Action of the trial court
A week-long trial was held in September 1996. The 12-member jury found that Mrs. Kiesewetter was not a fault. It allocated 90% of the fault to Darren, and 10% to Johnson and the church. It awarded Darren's stipulated medical expenses, $24,047.36, but denied general damages and disfigurement, as well as the Bells' claim for loss of consortium. The Bells moved for JNOV or new trial. The District Court commented that it disagreed with the jury's allocation of fault, but ruled that the evidence on that issue did not meet the standard for JNOV or new trial. The court did rule, however, that denial of general damages was legally wrong; the court granted JNOV on this issue, $80,000 for Darren's pain and suffering and $7,500 to each parent for loss of consortium. The total was subject to 90% reduction for Darren's fault.
The Bells have appealed, contesting the jury's failure to find Mrs. Kiesewetter at fault, the allocation of fault among the parties, and quantum. LIGA answers, urging that Johnson was not at fault, that the damages are excessive, and that JNOV was not proper as to loss of consortium. USAA also answers, urging the allocation of fault is correct, but that if Mrs. Kiesewetter is assigned any fault, the quantum should be reduced.

Applicable law
Drivers are required to exercise due care to avoid colliding with any pedestrian in the road. La. R.S. 32:214; Baumgartner v. State Farm, 356 So.2d 400 (La.1978); Myles v. Turner, 24,198 (La.App.2d Cir. 1/19/94), 632 So.2d 384. Specifically, motorists are charged with the duty to see what an ordinarily *107 prudent driver should have seen under the circumstances, and to avoid striking pedestrians in the road ahead. Geoghegan v. Greyhound Corp., 226 La. 405, 76 So.2d 412 (1954); Clomon v. Monroe City School Bd., 557 So.2d 1100, 59 Ed. Law Rep. 260 (La. App. 2d Cir.), writs denied 563 So.2d 886, 869 (1990), aff'd 572 So.2d 571, 65 Ed. Law Rep. 248 (1990).
Temporary custodians of children, such as school personnel and day care workers, are charged with the highest degree of care towards the children left in their custody, but are not insurers of the children's safety; supervisors must follow a standard of care commensurate with the age of the children under the attendant circumstances. Drueding v. St. Paul Fire & Marine Ins. Co., 482 So.2d 83, 58 A.L.R.4th 231 (La.App. 4th Cir.1986); Glankler v. Rapides Parish School Bd., 610 So.2d 1020, 80 Ed. Law Rep. 471 (La.App. 3d Cir.1992), writ denied 93-0017 (La.3/19/93), 614 So.2d 78. The duty does not require individual supervision of each child at all times and places. Id.; Comeaux v. Commercial Union Ins. Co., 269 So.2d 500 (La.App. 4th Cir.1972). However, fairly close supervision is required when students take a walking trip across a major thoroughfare. Foster v. Houston General Ins. Co., 407 So.2d 759, 1 Ed. Law Rep. 1402 (La.App. 2d Cir.1981), writ denied 409 So.2d 660 (1982).
The District Court's factual findings are not disturbed on appeal in the absence of manifest error. Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311, and citations therein. Appellate review entails more than sifting the record for some evidence to support or controvert the trial court's finding; it requires an examination of the whole record to determine whether the finding is plainly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In order to reverse, the appellate court must find that a factual basis does not exist for the trial court's finding, and that the record as a whole establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Reversal may be warranted when documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit it. Stobart v. State, 92-1328 (La.4/12/93), 617 So.2d 880. The manifest error rule also applies to the allocation of fault. Cay v. State, 93-0887 (La.1/14/94), 631 So.2d 393.
The District Court has much discretion in the assessment of general damages. La. C.C. art. 2324.1. The appellate court will not disturb an award of general damages unless the record clearly shows that the district court abused its discretion in making the award. Hae Woo Youn v. Maritime Overseas Corp., 92-3017 (La.10/7/93), 623 So.2d 1257; Coco v. Winston Industries Inc., 341 So.2d 332 (La.1977).

Discussion: Liability of the driver
By their first assignment of error the Bells urge the jury was plainly wrong in failing to find Mrs. Kiesewetter at fault. They cite the duty of a motorist to see what should be seen, e.g., Clomon v. Monroe City School Bd., supra, together with several cases imposing a heightened duty when the pedestrian is a child. See, e.g., Buckley v. Exxon Corp., 390 So.2d 512 (La.1980). They argue that the area was well lighted and that Mrs. Kiesewetter should have seen Darren crossing the street sooner than a split second before impact.
Mrs. Kiesewetter's insurer, USAA, contends that Darren darted into the street from a place of safety, leaving her little or no opportunity to take evasive action; thus it urges she did not breach her standard of care. See, e.g., Uriegas v. Gainsco, 94-1400 (La.App. 3d Cir. 9/13/95), 663 So.2d 162, writ denied 95-2485 (La.12/15/95), 664 So.2d 458, and citations therein.
We have closely reviewed the record. Mrs. Kiesewetter testified that after she saw the students in the extreme right lane and standing near the curb, she glanced across the whole street and saw nobody else. This was not contradicted, and will support the jury's conclusion that she exercised the requisite standard of care when children are present. Buckley v. Exxon Corp., supra. While it seems clear that Darren was not a fast runner, the enlarged photos of Jackson *108 Street (Exhibits P-6A and 7A) show that the distance he traversed to get from the McDonald's "Playland" to the middle of the street is actually rather small. The jury could reasonably conclude that Darrenwho admitted he did not even hesitate or look before entering the streetdarted from a place of safety and into Mrs. Kiesewetter's lane before she, in the exercise of reasonable care, could stop or take any effective action. Finally, Mrs. Kiesewetter admitted at trial that her view of Darren may have been obstructed by oncoming vehicles. While the witnesses' accounts of traffic at the time of the accident varied, all agreed that Jackson Street is heavily traveled. This lends support to Mrs. Kiesewetter's testimony regarding obstruction.
Considering this evidence as a whole, we cannot conclude that Mrs. Kiesewetter's testimony is critically implausible or internally inconsistent, or that it is so contradicted by objective evidence that no reasonable juror could accept it. Stobart v. State, supra. We therefore affirm the jury's judgment that absolved her of fault in this accident.

Liability of the church
By their second assignment, the Bells urge the jury correctly found the church at fault. By answer, LIGA originally asserted that the church was not at all at fault; in brief, however, LIGA concedes that some allocation of fault is probably not erroneous, and does not argue that Johnson was free of fault.
As temporary custodian of Darren, Johnson and the church owed him the highest degree of care. Drueding v. St. Paul, supra. The Bells contend that Johnson and the chaperones failed to supervise Darren adequately, in that they did not prevent him from leaving the group; they did not notice him going out the door, crossing the parking lot and jogging across the street; and they did not escort the boys to the street to assure safe crossing, or lead them to the traffic light where the crossing would be safer. The Bells also charge that Johnson and the adult chaperones made no plans for the boys to return safely to McDonald's after they finished their pizza; in essence, they abandoned the boys across the street. Southern v. Lyons, 97-19 (La.App. 3d Cir. 5/28/97), 696 So.2d 128, writ denied 97-1729 (La.10/13/97), 703 So.2d 617.
Johnson testified that he placed a high value on discipline and order among the teens on the trip. If he had said no when Jonathan Falloon initially asked for permission to leave, we feel certain that everyone would have stayed at McDonald's and the accident would not have occurred. Letting some students leave McDonald's was a departure from plans and entailed crossing a busy street. Cf. Foster v. Houston General, supra. The jury was entitled to find that Johnson breached the standard of care by changing the original dining plans and then failing adequately to monitor how many students left for pizza. The chaperones also failed to notice who left McDonald's.
LIGA does not contest that Johnson let the students cross in the middle of the block instead of at a nearby intersection, which would be the normal place for pedestrian crossing. La. R.S. 32:41 A(12); 32:232(1). Johnson claimed that he did this because leading the students to the intersection would have involved the danger of traversing McDonald's drive-through lane and driveways, then crossing Jackson at a "T" intersection with no marked crosswalk; he considered it quicker and less dangerous to go straight to the street and jaywalk. This "explanation" underscores the imprudence of altering the dining plans, and the jury obviously rejected it as an attempt to rationalize a hasty and unwise decision.
Even if Johnson's prior conduct was negligent, he could have perhaps averted the accident by properly escorting all students (including Darren) who wished to cross the street. Johnson testified that he led them to the street, or close to it, to make sure they crossed safely; this was not corroborated. Ms. Roeten, an adult chaperone, saw him walk them "toward" the street; Jonathan Falloon, one of the students, said he walked them part of the way; Jay Baker had no recollection either way; and Ms. Cooper saw no adults standing nearby. On this evidence the jury was entitled to find that Johnson *109 did not exercise reasonable care in helping the students cross the street.
Finally, the Bells contend Johnson and the other adult leaders breached the duty of care by failing to make arrangements for the boys to return safely to McDonald's after they finished eating pizza. It is negligent for the adult leader to abandon the children. Southern v. Lyons, supra. While Johnson's failure to plan for the boys' safe return was imprudent, we do not find this was causally related to Darren's injury.
In sum, the jury was entitled to find that Johnson and the chaperones breached the standard of care by altering their dining plans, allowing some students to cross the street without assuring that others stayed behind, inadequately supervising Darren inside McDonald's, not noticing that he left, and by failing to supervise all students who crossed the busy street.

Allocation of fault
By their third assignment of error the Bells contest the allocation of fault. Much of the argument addresses Mrs. Kiesewetter's alleged negligence; because the jury was not plainly wrong to absolve her, these points are not considered. As for the church, the Bells argue that the temporary custodian of a child should be predominately at fault when the child is hurt through the custodian's negligence, citing Southern v. Lyons, supra. They suggest that Darren was no more than 10% at fault. As noted, LIGA initially contested the 10% allocation of fault to Johnson and the church, but now urges only that their fault should not be increased.
The comparative fault of parties is usually considered in the light of various factors, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm, 469 So.2d 967 (La. 1985). The trial court's allocation of fault is subject to the manifest error rule. Cay v. State, supra; Towns v. Georgia Casualty & Sur. Co., 459 So.2d 124 (La.App. 2d Cir. 1984).
We have already outlined the reasons for finding the church at fault. Darren was also at fault. He testified that he followed all instructions on this trip; Johnson corroborated that Darren was mature for his age. Darren knew it was not normal for students to leave the designated restaurant without permission, and he did not ask for permission because he knew that Johnson usually only granted this to juniors and seniors. He also testified that although he knew better, he jogged directly into Jackson Street without stopping or looking. He did not notice any traffic until he reached the middle of the street and heard a horn.
We have closely considered the record and the relative duties of the parties. We find that the significance sought by the church's conductkeeping and supervising the students in its careis great. The church was aware of the dangers of inadequately supervising students on a field trip in an unfamiliar town with dangerous traffic. The record discloses nothing that required Johnson to act in haste or without proper thought in altering the dining plans or monitoring the students. Critically, Johnson had a superior capacity to prevent the accident; he could have denied the request to leave McDonald's, or better supervised those who crossed the street. For these reasons we find the jury was plainly wrong to assess only 10% fault to the church.
We recognize that the church's duty is commensurate with the age of the child and other attendant circumstances; Darren, at age 12, was still considerably older than the children in the cases cited in brief. Drueding v. St. Paul, supra; Glankler v. Rapides Parish School Bd., supra; Yates v. Children's Workshop, 555 So.2d 503 (La.App. 4th Cir.1989).[2] Nevertheless, Johnson loosely *110 granted permission to some students without ascertaining exactly how many would be crossing the street; he and the chaperones failed to assure that only those receiving permission would actually leave, did not notice when Darren left, and did not adequately supervise the crossing of a busy street. Under the circumstances, we are obligated to impose more fault upon the church than upon Darren.
Properly applying the Watson factors to this record, we will reduce Darren's fault to 30% and increase the church's to 70%. Judgment will be rendered accordingly.

Quantum
By their fourth assignment of error the Bells urge that $80,000 for general damages, fixed by JNOV, was inadequate. By answer to appeal, LIGA originally contended the general damages should be reduced; it now concedes, however, that the District Court was legally justified to award damages for Darren's pain and suffering,[3] and urges only that JNOV was improper to award loss of consortium. Br., 13-15.
As noted, Darren's principal injuries were a comminuted right humerus, bruised kidney and mild concussion. Two surgeries were required, one to repair the broken arm, the other to release the ulnar nerve; recovery time was harder on Darren than a normal patient, owing to his cerebral palsy. The bruised kidney caused a spell of bloody urine, and the concussion caused an incident of double vision in late December. Darren appears to have regained normal use of his arm by the summer of 1995, and he suffers from no residual disability.
General damages are subject to the "much discretion" of the District Court. La. C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., supra. On review we are unable to state that the instant award is a manifest abuse of discretion. We are cognizant of somewhat similar cases (involving broken arms, concussions and depression) in which the trauma or the physical aspect of the accident was less severe than Darren's but resulted in permanent, residual impairment. These nevertheless resulted in similar awards.[4]
In general, loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). The parents' claim for loss of service and society of their child is essentially the same, but excludes the sexual component. Rhodes v. State, 94 1758 (La.App. 1st Cir. 12/20/96), 684 So.2d 1134, writ not consid. 97-0242 (La.2/7/97), 688 So.2d 487. A child may sustain physical injury without necessarily causing his parents a loss of consortium. See, e.g., Wood v. Toys "R" Us, Inc., 28,667 (La. App.2d Cir. 9/25/96), 681 So.2d 49.
The evidence shows that Darren was "withdrawn" from his family for a period of time after the accident, but it does not show that the Bells lost any material services, financial assistance or fidelity as a result of the accident. The jury's failure to award loss of consortium, on these facts, does not mandate the JNOV, in that the facts and inferences of record do not "point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not have reached a contrary verdict," the standard for affirming the JNOV. Anderson v. NOPSI, 583 So.2d *111 829 (La.1991); May v. Jones, 28,106 (La. App.2d Cir. 5/8/96), 675 So.2d 275, writ denied 96-1466 (La.9/27/96), 679 So.2d 1354. This portion of the judgment will be reversed.

Conclusion
By a final assignment of error the Bells contest the assessment of costs. The court is authorized to render judgment for costs, or any part thereof, against any party, as it may consider equitable. La. C.C.P. art.1920. The judgment will be amended to assess costs to each party in proportion to its share of liability.
For the reasons expressed, the judgment of the District Court is reversed in part, affirmed in part, and amended. Judgment is rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Mike and Brenda Bell, individually and on behalf of their minor son, Darren Bell, and against Michael Johnson, Calvary Baptist Church and Louisiana Insurance Guaranty Association, in the full sum of Seventy-Two Thousand, Eight Hundred thirty-three and 15/100 ($72,833.15) dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all court costs, trial and appellate, are assessed 30% to Mike and Brenda Bell, individually and on behalf of their minor son, Darren Bell, and 70% to Michael Johnson, Calvary Baptist Church and Louisiana Insurance Guaranty Association.
AFFIRMED IN PART, AMENDED; JUDGMENT RENDERED.
Before MARVIN, NORRIS, BROWN, WILLIAMS and STEWART, JJ.

ON REHEARING
PER CURIAM.
LIGA cites Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, and urges that Calvary's percentage of fault can only be raised to the lowest affirmable level. This court has long applied the "much discretion" rule to allocations of fault. See, e.g., Towns v. Georgia Casualty & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984). Our disposition of the instant case is in accord with the principles of Clement and Towns. Calvary's fault has been raised to the lowest, and Darren's fault lowered to the highest, affirmable amount.
By separate application the Bells urge that LIGA's right to contest the award of consortium was barred because LIGA "paid the judgment rendered against it by the trial court in full and preserved no rights to appeal." La. C.C.P. art. 2085 precludes appeal by a party who confesses judgment or "voluntarily and unconditionally" acquiesces therein. LIGA actually placed the judgment amount in court registry "pending the appeal." The motion to deposit funds does not clearly show acquiescence in the judgment. See Vincent v. State Farm, 95-1538 (La.App. 3d Cir. 4/3/96), 671 So.2d 1127, and citations therein.
REHEARING DENIED.
NOTES
[1] Calvary's original insurance carrier was Lutheran Benevolent Insurance Company. Lutheran was liquidated and Louisiana Insurance Guaranty Association ("LIGA") was substituted as defendant on April 22, 1997, after judgment was rendered.
[2] Foster v. Houston General Ins. Co., supra, found a breach of duty to a 17-year-old mentally retarded boy with a mental age of about 7. Prier v. Horace Mann Ins. Co., 351 So.2d 265 (La.App. 3d Cir.), writs denied 352 So.2d 1042, 1045 (1977), found no breach of duty to a normal 11-year-old boy. Both of these cases antedate comparative fault.
[3] See, e.g., Chambers v. Graybiel, 25,840 (La. App.2d Cir. 6/22/94), 639 So.2d 361, writ denied 94-1948 (La.10/28/94), 644 So.2d 377; Daigle v. United States Fid. & Guar. Co., 94 0304 (La.App. 1st Cir. 5/5/95), 655 So.2d 431, and authorities therein.
[4] Williams v. City of Monroe, 27,065 (La.App.2d Cir. 7/3/95), 658 So.2d 820, writs denied 95-1998, 95-2017 (La.12/15/95), 664 So.2d 451, 452; Boddie v. State, 27,313 (La.App.2d Cir. 9/27/95), 661 So.2d 617; Torbert v. Licciardi, 94-2026 (La.App. 4th Cir. 4/24/96), 673 So.2d 1213, writs denied 96-1302, 96-1168 (La.6/21/96), 675 So.2d 1082; Liner v. Terrebonne Parish, 612 So.2d 168 (La.App. 1st Cir.1992); Boyle v. Board of Sup'rs, 95 1803 (La.App. 1st Cir. 4/4/96), 672 So.2d 254, 109 Ed. Law Rep. 484, rev'd on other grounds 96-1158 (La.1/14/97), 685 So.2d 1080, 115 Ed. Law Rep 587.